# 7551

## S T A T E   O F   L O U I S I A N A

### PARISH OF ORLEANS

----------------------------------------------

GASPARD CUSACHS            :     No. 7551,

         versus              :

                             :     COURT OF APPEAL

SALMEN BRICK & LUMBER COMPANY, Ltd.   :

----------------------------------

**Max Dinkelspiel, Judge.**

---------------------------------------------

The issues presented in this case are substantially as follows:

Plaintiff asserts that he is the owner and actual possessor of a certain portion of land, together with all the improvements and appurtenances thereon, rights, ways, privileges, servitudes and dependencies thereon belonging or in any wise appertaining, situated in the Parish of St. Tammany, in this state, designated by the No. 3 on a sketch paraphed "Ne Varietur"by Octave Blanche Derieseurt, Notary of this city, dated October 14, 1870, said portion of land measuring, more or less, 80 chains on one side, 89 chains on the other side, and 34 chains on the rear part of said portion of land fronting the Bayou Lacombe, the whole containing more or less 197 superficial acres, after deduction out of said portion of land Lot No. 3 fifty superficial acres which belong or belonged to Mr. Martin, as per said sketch; that the said grounds are filled with shrubbery and fine shade and ornamental trees, and a house which petitioner occupies whenever he visits the said land; that on the banks of and facing Bayou Lacombe there were growing in a row and close together four large ornamental gum trees, which were pleasing in appearance, which ornamented the property, and which protected the property from the overflows of the aforesaid bayou; that he acquired together with his deceased brother, Joachim Cusachs, from whom plaintiff inherited the property in 1870; that he kept said trees in fine condition, and, aside from his attachment resulting therefrom, their beauty and position and natural growth added to the value and attraction of the property; that he intended them as ornaments to the property, intending that they should give an added

dignity to the property whenever he occupied it and when he built another home thereon, as he intends to do.

He alleges further that on or about February 8, 1916, while plaintiff was absent from the property, a party of men, acting under the orders of one E. J. Stockstill, invaded the said grounds of petitioner and proceed with axes, saws, or some such instruments, to cut down and destroy the aforesaid trees and to remove them from the said property, although the said Stockstill and his men were warned then and there by one of the men in the party that the trees and the property were owned by plaintiff; that the trees were entirely destroyed and removed, the beauty and symmetry of the property destroyed, and the row of trees taken away; that the action of the said trespassers was wanton, malicious, and a gross violation of petitioner's property rights guaranteed by law; that said Stockstill and the men in his charge who did the aforesaid deeds were the servants, agents and employees of the Salmen Brick & Lumber Company, Ltd., a corporation organized under the laws of the State of Louisiana and domiciled in New Orleans, and were at the time of the trespass aforesaid actually engaged in the service of said company, and the said company affirms their right so to do, and justifies the said trespass. He claims further that in order to destroy the said trees said Stockstill and his men invaded petitioner's property without authority from petitioner and without soliciting leave to do so; that they have thus committed a trespass and injured petitioner's property. He asserts that the mercantile value of the said trees was $100.00, and that in addition petitioner is entitled to be compensated for the wanton invasion of his rights of person and of property, and he lays and assesses his damage for this at the sum of $2500.00, alleging that the said Salmen Brick & Lumber Company Ltd. is therefore indebted unto petitioner in the full sum of $2600.00. He finally prays that said company be cited, through its proper officer, and that after

all due and legal delays he have and recover judgment in his favor and against the said Salmen Brick & Lumber Company Ltd. in the full sum of $2600.00, with 5% interest thereon from judicial demand until paid, for costs, and for all further general and equitable relief, and for such orders as the nature of the case requires.

In due course, and on October 3, 1916, the Salmen Brick & Lumber Company answered this petition, admitting that plaintiff does own land fronting on Bayou Lacombe, but the extent of which they are not informed. They admit, further, that plaintiff occupied a house situated in the Parish of St. Tammany, on land owned by him, and that said house is surrounded by shrubbery shade and ornamental trees. They admit that on the banks of Bayou Lacombe there were certain gum trees which were cut by the agents of your respondents, but deny that said trees were on plaintiff's land. They deny that the beauty and symmetry of plaintiff's property was destroyed by the cutting of said trees. They deny and assert that no trespass was committed by their agents, as said trees were on property from which respondents had the right to cut said trees. They deny all rights to the property in question claimed by plaintiff, and pray, finally, that his demand be rejected, at his cost.

Some correspondence followed between the parties and, amongst others, there is a letter of date February 16, 1916, addressed by the defendant company to the plaintiff, which substantially admits that his letter of the 14th of the same month and year, with reference to cutting of some gum pine timber was received; that they had taken this matter up with Mr. Stockstill, who was the foreman at Lacombe, and he states that he cut four gum trees, and throught at the time he was cutting them from the lands of the W. W. Carre Lumber Company, he having had permission from them to cut gum on their land; that these lands were pointed

out to him as the property of said company, through parties residing in the neighborhood, one Rice and one Martin, and deny that they cut any pine trees or any other trees of any kind or character off of this property. In concluding their letter, they go on to say: "In your letter you state that you are going to prosecute us to the full extent of the law for cutting this timber. We do not at all think it necessary to go to court on a little matter like this, as it was purely unintentional on our part to cut timber which we had no right to do, and having made a mistake in getting on your land, we are willing to pay you for these four gum trees anything that is within reason. We would thank you to let us know how much you consider these trees worth, and if it does not seem out of reason we will be glad to mail you our check for that amount."

In reply to this letter, on February 21, 1916, plaintiff says: "I have just returned from a trip to Lacombe and found your letter. You say in your letter that it was purely unintentional. I went over to Lacombe in order to gather evidence, and I have the witnesses that will swear that Mr. Stockstill was told that the property belonged to Mr. Cusachs. He said it belonged to Carey, and was told again that it was Cusachs' property. He then said 'Go ahead and cut it.' For your information now, Carey does not own an inch of land in Lacombe, outside of the sawmill property. Surely that way of doing things is very offensive and deserves to be severely punished, and I don't like to be treated in that way and have to stop that kind of treatment." (Signed by the plaintiff, through his initials, G.C.).

The record abounds with deeds to property on Bayou Lacombe from various parties, which need not be here quoted, as we are not trying title to property in this cause.

Under a commission issued, depositions were taken in the

Parish of St. Tammany of John Martin, C. H. Culbertson, Napoleon Silva, Felix Cousin, Nedar Cousin, Manuel Silva, Polite Atlow and Augustin Sil.

An endeavor to prove title to property by these witnesses was overruled by his Honor, the judge of the court a que.

Getting down to the question of the cutting of trees and trespass, Captain Martin, at page 49 of the transcript, was asked this question:

> "Q:  What happened to these four gum trees?
> "A:  I ran down there and saw the trees were cut by Mr. Salmen's men working there, and I asked the gentleman in charge, Mr. Stockstill, and he told me that he had ordered them cut and he thought that they were on Mr. Carey's land. I told him no, it was Mr. Cusachs' land, and he says 'That's all right, if they are on Mr. Cusachs' land we will pay for them.' He says 'What are they worth?' and I says 'I don't know; I have no price to make on them.'
> "Q:  Did Mr. Stockstill ask your permission before going on the land?
> "A:  No, sir. But he did say that some of the men working under him had informed him it was Mr. Cusachs' land, but of this he wasn't sure.
> "Q:  Were they old trees?
> "A:  Yes, sir; I suppose they were trees at the stump about 14 or 15 inches; probably more. I cannot say sure. And they were solid trees.

He adds to this:  "As a rule gum trees, large ones, are hollow, but medium size trees are solid."

This witness has known this property about 36 or 37 years, and he knew the trees on there about the same length of time. There were no improvements upon the property, except an old stable that had been standing there no telling how long (p.50 Transcript). There were no fences around the property at the time the trees were cut. He reported the cutting of the trees to the plaintiff. He lived close to the property in question - about a mile and a half. There were other trees, either gum or pine, growing all over the bayou. The lands were subject to overflow whenever high water ensued; this occurred three or four times a year, depending on the rains.

C. H. Culbertson testified, on page 58 of the transcript, that he lives in Lacombe; knows the piece of

property in question belongs to plaintiff and has been
in the possession of plaintiff about 35 years; it adjoins
the property of Mr. Martin. He knew the land; he didn't
know particularly of these trees; he never saw them cut;
knew nothing about them (transcript p. 59); never heard of
anybody else owning the property save and except plaintiff;
Captain Martin had charge of the property for plaintiff;
plaintiff never lived on that particular property, he lived
in Bayou Lacombe, about a mile and a half from the hotel.

Napoleon Silva's testimony appears on page 62 of the
transcript. He hauls wood and logs, cuts wood; he knew the
property in question and that plaintiff always owned it; he has
known that twenty-five or thirty years; was born in that
particular place; is 44 years of age; he was not present
when the trees in question were cut; he presumed they be-
longed to the plaintiff, those that were cut.

Felix Cousin testifies at page 66 of the transcript.
He has lived in that part of the country all his life, and
he was then 39 years old; knows that the property in question
always belonged to the plaintiff; he had cut timber from
the adjoining property of a Mr. Todd, - adjoining plain-
tiff's property. That was about all that he knew, so far
as this case is concerned.

Medar Cousin's testimony is to be found at page 68 of
the record. He substantially testifies that plaintiff had
owned the property in question as long as he can remember;
he is about 46 years of age; he had also cut logs from
Todd's place, adjoining plaintiff's.

Manuel Silva, at page 69 of the transcript, testifies
that he is 35 years of age; knows the property at White's
Landing belongs to plaintiff, he, plaintiff, claiming it

all the time; knows about the gum trees that were cut on that property; that Mr. Stockstill cut them and loaded them on the barge; that he was loading the barge for Stockstill; was present when the trees were cut; they were on the west side of the bayou, right on the banks of the bayou, at some four or five hundred feet from White's Landing.

"Q: Did you hear anything said, or did you say anything to Mr. Stockstill, when they were cut?

"A: No, sir. Captain Martin came over there and asked him who authorized him to cut the trees, and Mr. Stockstill said he was cutting them on Salmen's land. Captain Maryin told him that the property belonged to plaintiff, and his answer was he was going to cut them anyway. He cut them and loaded them and took them away. They were loaded on Salmen Company's barge.

On cross-examination, he stated:

"Q: Are there any trees around where these four gum trees were cut?
"A: Yes, quite a few black gum trees.

He had frequently seen the land there overflow, and that was the fact while these trees were there; the water at times was 6 or 7 feet deep; it was northeast, towards the Martin place.

Polite Atlow, page 72 of the transcript, testified that he was 62 years of age; bred and born in that part of the country; knew all about it; he had been running schooners; got his sand off of the place, which always belonged to plaintiff.

Augustin Sil, whose testimony is found at page 74 of the transcript, testifies that he knows that the property in question is the property of plaintiff; has known it thus for 25 years; had chopped wood for plaintiff off the place.

The transcript, at page 77, gives the testimony of plaintiff before the court, and, after stating other things, he says that he lives off of the income of his revenues; that he is president of the Louisiana Historical Society, and one

∎

of the curators of the State Museum; that between him and his brother they owned the property in question all their lives; that some of it he bought, and his brother had bought the property in question some 37 years at the time of this suit; his brother formerly used to make cord-wood on the place, cut logs, sell sand off the sand-banks to schooners coming there; the trees in question that were cut were situated near the south corner of the property belonging to the turpentine factory and known as the turpentine property; had physical possession of same; it has been enclosed with a fence since this litigation began; the stable was about 200 feet, approximately; all the ground is the same, approximately, in the Parish of St. Tammany, and surrounded with all sorts of trees on the bank of the bayou -- a number of trees, gum trees; the bayou has a sloping bank; the roots helped to hold the bank up in high water and in rainy weather; has some teams of oxen there, - cows; never wanted to destroy any of the trees on the banks of the bayou, because he wanted to build on there a home for himself in his future days and wanted to establish a stock farm.

Page 79:

> "Q:  Did the trees have any particular value
> other than the commercial value?
>
> "A:  They had the value that I always refused
> to get money from them. There is no money
> value; it is sentimental. I have always
> refused to cut any timber on that land."

Amused himself frequently by fishing under the trees, hunting; they were small gum trees; gum trees, as a rule, are all hollow, but these were solid and had beautiful leaves and limbs, and were very nice trees; he had known these trees ever since he had been going there, about 37 years; never gave anybody any permission to cut them; discovered they were cut three or four days after it had been done.

At page 82, the witness goes on to state that this

■

was practically a virgin forest; trees had never been cut or turpentined; everything in that neighborhood had been turpentined except on his property.

On cross-examination, he stated that neither he nor his deceased brother had ever lived on that particular piece of land; they lived a mile and a half or two miles in the village; the land in question is the same as other lands in St. Tammany Parish, and in that particular section of the country there are a great many trees of a similar kind; they are always green; the stock that is kept there keeps very well, always in first-class condition. He says it is not subject to overflow - only heavy rains will cover that portion; sometimes water stands there for two days; land never overflows.

At page 85:

"Q:    These gum trees, were they different from
       other gum trees that grow along the swamps or
       shore of Bayou Lacombe?
"A:    The same thing.
"Q:    There are millions of them in that section
       of the country, along the waterways?
"A:    There are a great many.
"Q:    How do you figure the commercial value of
       these trees at $20.00 or $25.00?
"A:    I, like the Salmen Lumber Company, put my
       own valuation on my property. If I trespassed
       on their property you would see what their
       trees are worth."

Further testifying, he said that the sentimental value is thousands of dollars, but the commercial value should be about $20.00 or $25.00, because the trees were solid, and if cut by the Salmen Lumber Company it was simply for the reason they wanted to use them for rollers or something else, as these trees were solid and gum trees are not usually solid; the lumber company in cutting the trees had a purpose and they needed it; if there were thousands like that they would not need to come to his place, because they owned thousands of acres of land; the trees in question were about 16 inches at the big end.

■

442

"Q: Can yeu give us any reasen why yeu said they
were werth abeut $20.00 er $25.00?
"A: Well, it is simply my estimation ef it. I was
effered te sell, they wanted te buy them, - the
bex faetery in Laeembe had effered te buy all the
gum trees I had, and I have always refused."

E. J. Steekstill testifies at page 91, and says that
he is the man whe eut the gum trees that this suit is abeut;
was empleyed by the defendant eempany; was loading pine
piling en barges in Bayeu Laeembe and he had erders fer feur
pieees ef gum 10 inehes in diameter, 20 feet leng, te be
leaded en with the pine piling; had finished his leading,
get the barge leaded as high as he wanted, and mentiened te
a party werking with him abeut getting feur peles te send
in with that lead; the man in questien, ene "Buek" Riee,
was helping him te lead the piles that were eut en the
west side ef the bayeu, and he asked this man whese land
it was, and his reply was that it was timber that belenged
te Salmen & Keller; and that Riee subsequently stated
that the land belenged te Henry Keller; the timbers eut
were 20 feet leng by 10 inehes, pessibly net mere than 9.
Speaking ef the value (p.92), he says that he was offered
the same eharaeter ef peles fer 25 eents apieee. He further
says that there is no market for that ehaaeter of lumber.
Had been getting timber areund St. Tammany Parish 20 er 25
years; in faet, it had been his business all his life.

"Q: What is the eharaeter ef the land en the edge
ef the river, where yeu eut the gums?
"A: It is lew, beggy, wet land; gum swamp."

At the time ef the eutting there was abeut a feet ef
water; is very familiar with that pertien ef Bayeu Lacembe;
had been there frequently; the water frequently gets five
er six feet deep, right at the peint.

"Q: Was there any differenee between this gum
swamp where these trees were eut and any other
gum swamp areund the banks of Bayeu Lacembe?
"A: No, sir; just an erdinary gum swamp.

■

443

There were quite a number of them all through the bayou; a great many scrub top oaks, but most of them were little gums.

At page 94 of the transcript:

"Q: Did you know this man Martin, who was in charge of Mr. Cusachs' Property?
"A: Yes, sir.
"Q: Did he come to you and speak to you about cutting these gum trees?
"A: Yes, sir, about a week after I cut them.
"Q: He didn't come to you at the time you cut them, or immediately afterwards?
"A: He came to me when I was loading my next barge. I sent that barge about five or six days later, after I had cut the trees.
"Q: Was this the first time he spoke to you about the trees?
"A: That is the first time I ever saw him to know him. He introduced himself to me.
"Q: Did you ever know that Mr. Cusachs, the plaintiff, owned or ever claimed to own any land there on the bayou?
"A: On the bayou, no, sir."

At page 97, on cross-examination:

"Q: Now, if there is testimony in this record to the effect that you were told at the time you cut the trees that there were Mr. Cusachs' trees, and you said 'To hell with Cusachs; go ahead and cut them'; Would you deny that?
"A: Yes, sir. Mr. Cusachs' name wasn't mentioned at all. If it was, I have no recollection. I don't think anybody said it was Mr. Cusachs' land."

Henry Keller, page 101 of the transcript, testified:

"Q: Do you own any of that land in there, aside from Section 42?
"A: I own Lot 2½ lying on the south of Cusachs' property. I own land there. I am more familiar with that than I am with the map now being shown me."

Has known the property for 30 years; the trees were cut on land low, flat, swampy; generally overflows. The water there gets 7 or 8 feet deep, at times.

"Q: Do you know anything about the value of these gum trees that were cut?
"A: I don't know anything about the value of them, but I knew about the value of gum trees.
"Q: That is what we want to get at, what you know about it.
"A: The value of these trees, according to my judgment, would not be over 50 cents apiece, at the outside. (p.104).

J. W. Magee's testimony is found at page 104 of the transcript. He lives at Bayou Lacombe; knows the land in question adjoins Henry Keller's land; knew it as the Martin Tract; lived in that section of the country about 45 years; was born there; is 55 years of age; has been on the land frequently; saw the evidence, - stumps were lying on the ground where the trees had been cut.

At page 106 of the transcript:

"Q: What, in your opinion, was the value of these gum trees?
"A: The value of these, I don't know. I think 50 cents apiece would be a fair price for them.
"Q: Will you state whether or not there was any market for timber of that kind in that section of the country?
"A: If there is I have never found it. I have a good many on my land and never found a market for it.
"Q: Where is your place, compared with the Cusachs' property, - how far?
"A: It is probably a mile south, next to the depot, the railroad. Yessir, it fronts on the bayou. Quite a number of gum trees.
"Q: What would you sell them for?
"A: If I could get rid of them at a quarter apiece I would be glad to get them off of my land. But I have in the pasture there some I would like to get rid of, to clear off for the hog pasture.
"Q: What is the character of this land where Mr. Cusachs claims the trees were cut, - high or low?
"A: Low. Right on the edge of the bayou.
"Q: Does it overflow, or not?
"A: Yes, sir, it overflows. I have seen 7 feet of water right where these trees were cut, at least 7 feet, in high water. Running legs there.

He goes on to testify that Bayou Lacombe overflows at this point two or three times a year, whenever a heavy rain falls; that he has run legs there as many as four or five times during the year from high water.

"Q: Will you state whether or not the cutting of these trees from Mr. Cusachs' land was any detriment to his land, or injury to his land?
"A: I couldn't see there would be any great benefit to it, these little gum trees.
"Q: Were these the only gum trees growing in that portion of his land, or were there others there?
"A: There were others there.
"Q: A few, or many?
"A: A good many"

445

L. F. Miles, another witness for defendant, at page 109, testifies that he is an employee of the defendant company; general superintendent;knew the Cusachs property on Bayou Lacombe and other lands in the vicinity; says it is low, swampy land, subject to overflow; the trees on that land, the stumps are about 12 or 13 inches in diameter; the top looked to be about 10 inches; some of the tops are laying there yet. Speaking of the value of the trees, he testifies that $1.50 a thousand feet would be about the stumpage value of them, and it would take to make a·thousand feet of these trees probably at least twenty.

Howard Burns, at page 113, says that he was the Parish Surveyor of the Parish of St. Tammany, and has been such since 1906; is familiar with that section of land, surveyed it, and goes on to describe it. It is useless to give his testimony in full, or to quote much from it, because it is entirely with reference to the measurements of the land in question and has no connection with the cutting of the trees claimed by plaintiff in this cause.

The plaintiff, being recalled in rebuttal, at page 123 of the transcript, amongst other things testified that shortly before the trial of this case he had gone over this property, and says:

"The land is as high as it is anywhere else, much higher. It is a levee; it is rolling; it never overflows; but nearing the bayou there is a slope of about seven feet; all that covered with green grass and trees, very thickly covered with trees."

And at page 127, he goes on to say:

"My property is covered with trees, not thickly, but covered with good size trees, and it is all there on the bank, in the rear, all over. You can pass in there.

446

Some of it is pretty think. And the other property, that piece and the Keller, has had all the timber cut on it, and before the timber was cut on it it was turpentined. So you can see by going over the place the marks of turpentined stumps and trees, and on my side you see nothing of that."

Arising from full consideration of all the testimony taken, both by deposition and orally before the judge a que, we conclude that the facts preeminent in this case have no earthly connection with the case referred to of Tissot et al. v. Great Southern Telegraph Co., to be found in record No. 18,951 of the docket of the Civil District Court, and subsequently on appeal to the Supreme Court found in the 39 An. 996, being a suit for $2500.00 damages for trespass on plaintiffs' premises, injury done to valuable trees thereon, etc., by employees of the Telegraph Company, defendant in that suit, whose action is characterized as wanton, malicious, and violative of the rights of petitioners (see p. 998).

That was property situated on the Bayou St. John, a magnificent residence belonging to the plaintiffs, and defendant, without notice of any kind, in order to construct a fire alarm telegraph over a designated route, there being trees on that route, the limbs cut off were an impediment to the execution of the contract, defendant claiming that no more limbs were cut than was necessary, claimed want of malice, and that only actual and compensatory damages were due, if any. The court goes on to say that the acts complained of were consummated whilst the plaintiffs were away from the state, keeping a female servant on the place and occasionally a gardener; that there was no authority from the occupants or the owners, and keepers were kept for the protection and not for the destruction of the property in question. And it was evident, says the court, at page 1004, that plaintiffs sustained injury in the wanton invasion of their

447

premises, in the unjustified destruction of their property, in the deprivation of material, physical and moral enjoyment, in the endurance of aggrieved feelings, and in the apprehension of a possible irremediable wrong, for all of which they are entitled to compensatory damages. The court goes on to cite R. C. C. 1928. At page 1005 the court cites R.C.C.1934, 4 An. 440, and 10 An. 33, to the effect: "The Code provides that in cases of unlawful deprivations of some legitimate gratification, although the same are not appreciated in money, yet damages are due."

That case and this differ so materially, insofar as the facts are concerned, that, in our opinion, they are not comparable at all and have no application to the present case.

In the case of <u>Gardere v. Blanton</u>, et al., 35 La. An., 811, the syllabus reads:

> "When the trespass is not wilful, but the result of mere inadvertence, the value of the timber when first cut is the measure of damages."

In the case of <u>Zagame v. Chalmette Laundry Co.</u>, 142 La., 251, the court gave the nature of the action as follows:

> "Plaintiff alleges that she rented a certain lot belonging to her in the City of New Orleans to the defendant for a rental of $5.00 per month, the lease to continue for one year. She also alleges that during the pendency of the lease the defendant destroyed a stable and concrete floor on the lot worth $175.00, for which she claims damages in the sum of $175.00. She makes a further claim for $2500.00 based on an alleged invasion of the property by the lessee during the pendency of the lease, and for a trespass thereupon, referring to the alleged destruction of the stable and concrete floor referred to above. Defendant excepted to the petition on the grounds that it disclosed no cause of action, and that the demand was premature.
> "The claim for $2500.00 damages, based upon an alleged trespass upon an invasion of the property by the tenant leased by it from the plaintiff, is so greatly inflated and unreasonable that the court will take cognizance thereof and transfer this appeal, as the claim must necessarily be for less than $2,000.00 and this court is without jurisdiction."

We are convinced that plaintiff's idea in reference to his valuation of the property herein before described is absolutely beyond even what the most reasonable of men have a right to judge or estimate values of the kind in question. Besides,

we are further convinced that there was no willful violation of any of plaintiff's property rights, no malice, either on the part of the agent Steckstill, much less that of the defendant herein. That fact is proven by the testimony of all the witnesses for the defendant in this case, as well as by the description of the property claimed by the plaintiff. Situated as it was, on Bayou Lacombe, which, after rainy seasons has been shown to continually overflow just where these trees were located, and at other points all along the bayou, there could not have been, under any circumstances, any character of value, no matter how deeply plaintiff may have felt the loss of the trees in question, as put by him. But, as stated at the outset of this case, we are not trying the title to the property in question.

From all that has been testified to, we are satisfied that these trees were cut and the property entered without permission of the owner; and that being the case, whether malice was intended or not, the law holds the defendant liable for some damages for the unlawful entry and cutting of the trees in question, and we fix that now at the sum of $50.00. As to the value of the trees, the judge a que, after hearing of the testimony in the case, has come to the conclusion that the highest value for them would be 50 cents apiece, - four of them $2.00, which judgment we think absolutely correct.

It is therefore ordered, adjudged and decreed that the judgment of the court a que be ~~maximum~~ amended by adding $50.00 to the $2.00 judgment heretofore rendered in this cause in behalf of plaintiff, Gaspard Cusachs, and against the Salmen Brick & Lumber Company, Ltd., making the judgment $52.00, and with costs in both courts. As thus amended, the judgment is affirmed.